h BYRNES, Judge.
KP appeals a juvenile court judgment dated July 8, 1999, which terminated the parental rights of the mother and three fathers of three minor children. The fathers do not contest the termination of their parental rights. We reverse in part.
KP is a single mother of the three minor children. Her son, CP, was born on December 2, 1992. Her daughter, KPP, was born on September 27, 1995, and her daughter, KMP, was born on January 4, 1997.

Statement of the Case

On April 25, 1997 the children were placed in the custody of the State of Louisiana, Department of Social Services, Office of Community Services (“DSS/OCS”). After a continued custody hearing on April 28, 1997, the daughters, KPP and KMP, were continued in DSS/OCS custody; however, the son, CP, was returned to his mother’s custody under the supervision of DSS/OCS.
After a “child in need of care” petition was filed, the children were found to be in need of care on July 1, 1997. A case plan was submitted. On November 20, 1997, CP was placed in the custody of DSS/OCS. After another hearing on 1 ¡.November 24, 1997, CP was continued in DSS/OCS custody. A second “child in need of care” petition was filed and the children were adjudicated to be in need of care on March 11, 1998.
In the adjudication judgment, the mother was ordered to undergo substance abuse treatment, to take her medication and to complete parenting classes. The case plan goal was reunification of the children with the mother. The fathers were absent but represented. After the mother filed a motion for readjudication, the juvenile court ordered a new case plan, and on September 24, 1998 a consent judgment was reached. The new case plan included supervised weekend visits, individual therapy, and a re-evaluation for psychiatric medication.
DSS/OCS filed a petition for termination of parental rights against the parents on February 22, 1999. After a trial on May 12, 13, and 14, 1999, the juvenile court granted the termination of parental rights on July 8, 1999. The judgment also decreed that the children were eligible for adoption pursuant to law. Further, the judgment decreed that DSS/OCS was granted continued custody of the children and DSS/OCS was ordered to furnish the juvenile court with a written plan for the permanent placement of the children within 90 days of the judgment.
In its reasons for judgment, the juvenile court noted that the mother “obviously loves her children very much.” The juve *136 nile court found that the mother had poor judgment and parenting skills. It was convinced that her lifestyle will continue for the foreseeable future, and would prevent her from providing an adequate home for her children. KP’s appeal followed.
| ^Statement of Facts
Serena Grabert testified that she knew KP and her children for more than ten years. When the son CP was a year old, Ms. Grabert related that KP treated him roughly and threw him around. Ms. Gra-bert tried to counsel KP. Ms. Grabert became the foster mother of the daughters, KPP and KMP.
Sylvester Burrell, DSS/OCS supervisor of the child protection unit, testified that the agency received a complaint in 1995 about three-year-old CP, who was found wandering by a swimming pool in an apartment complex.
In June 1995 KP was arrested in a separate incident for cruelty to CP was arrested on drug charges. The charge was dismissed when KP entered a guilty plea to distribution of cocaine. At the time of these arrests, KP was pregnant with KMP.
On April 22,1997, Danette Jones, a child protection investigator, received an allegation of abuse of KPP. The three-month-old baby was in Children’s Hospital for bruises on her head and face. She had bite marks on her body, at least one of which was from an adult human bite mark.
Dr. Scott Benton, an expert in pediatric forensic medicine, treated KPP and found that her injuries were caused by at least three separate blows and an adult biter. KPP had a thrush, a fever, and was anemic. Dr. Benton said that the injuries were not permanently disabling.
KP explained that she left KPP with a four-year-old neighbor and two adults in the apartment for five minutes while she went downstairs to help her father who was working on a car. All the children were placed in foster care; however, the son, CP, was returned to his mother in April 1997.
|4KP agreed that from the time of birth until KMP was three-months old, KP placed KMP with a woman, Javetta.
In May 1997, KP was sentenced to five years inactive probation for distribution of cocaine. In October of 1997, DSS/OCS received the first of three complaints about KP’s care of the son, CP. Sharon Peters was the child protection investigator. On October 16, 1997, it was reported that KP was arrested for child desertion. Angelle Reese, a neighbor, testified that five-year-old CP was found wandering the neighborhood while he was carrying a portable phone at 7:00 p.m. Ms. Reese took CP to her house while other neighbors looked for KP. The police were called. After 45 minutes Ms. Reese took CP home to get his shoes and leave the phone. KP did not answer the neighbors’ verbal calls. As the police arrived, KP came from the rear of the house. KP related that she had been sleeping in the child’s bedroom, and then said she was sleeping in the bathroom.
On November 7, 1997, DSS/OCS received a complaint that CP was often tardy or absent from school. KP was not available to pick him up from the bus on two occasions. Eileen Danna and Kathy McGathy, the social worker and teacher from CP’s Head Start program, testified that CP was late or absent 20 of 33 days of school. They unsuccessfully tried to help KP establish a routine for her and CP. KP told Ms. McGathy that CP cooked meals for himself and his family. CP said he had bruises from falling when he was on the roof after he went there to fix something. He related that KP sent him onto the roof because he was the man of the house. CP reported that KP often left him alone. KP denied that she sent CP onto the roof. KP explained that she lived in an apartment, and the landlord was responsible for fixing the roof.
15On November 14, 1997 CP had two bruises. One was from a fall at McDonald’s play area. CP stated that he got *137 the other bruise when he fell from “Daddy Patrick’s truck.” CP related that he was left sleeping in the truck and fell when he tried to get out by himself. KP said she was in the truck with CP when he opened the door and fell. KP acknowledged that Patrick watched CP when she worked nights. Although she was under DSS/OCS supervision and caretakers were to be approved, KP did not tell DSS/OCS about Patrick. CP was placed in foster care on November 21,1997.
Beulah Moore of the St. Bernard Parish Substance Abuse Clinic testified that KP began their program in February 1997 as part of her criminal case. KP did more than the required number of substance abuse treatment sessions, but she did not follow the sexual addiction sessions or the psychiatrist’s recommendation for medication to stabilize her mood swings. Ms. Moore said that KP needed long term individual counseling for her impulsiveness.
Marilyn Robinson of the YWCA Parent Training Program, testified that KP had perfect attendance when she completed the eight-week program on July 23, 1997, with a score of 77 of a possible 100 on the objective test. After CP was placed in DSS/OCS custody, KP was referred back to the program. She completed the program with a 95.5 score. Ms. Robinson noted in a discharge report that KP needed maturity and consistency, and further counseling was recommended.
Yolanda Scott of the YWCA program attempted to provide in-home training and on-call assistance. Ms. Scott observed that “the mother was very affectionate to her children.” KP did not make use of the assistance when Ms. Scott would not write a report recommending the return of the children to KP. On cross-examination Ms. Scott stated: “I would say [the mother] is very nurturing. She 1 Jiugs her children a lot.... It appeared with me, that her children were her priority.”
Dr. Rafael Salcedo, an expert in psychology, testified that he evaluated KP in August 1997 and tried to provide therapy for KP in March 1998. Dr. Salcedo, along with the psychologist, Dr. Tetlow, and psychiatrist, Dr. Anastasio, concluded that KP has a mixed personality disorder with antisocial and borderline features. Dr. Salce-do found that KP does not recognize danger. Although she was not evil, she is immature, uses poor judgment and has disturbed interpersonal relationships.
After CP was placed in DSS/OCS custody in November 1997, his foster mother, Julie Vignes, stated that CP told her that “Noon” had played sex with him, and that Mikey and Shane played sex and swam in the ditch. “Noon” or Ulysses Pierre, was in jail for rape at the time of the parental rights termination trial. KP said that CP made the same allegation in front of Noon who had been HP’s sister’s boyfriend. KP thought the allegation was “wrestling.”
Dr. Scott Benton examined CP but found no physical evidence of abuse. Dr. Benton related that CP sang, “don’t let that man sleep on top of me” and “I don’t want that man in my bed.”
Dr. Valerie Turgeon, a psychologist, evaluated CP, who said that people smoked weed and drank beer at his mother’s house. Dr. Turgeon noted that KP talked to CP at the daycare center without permission prior to Dr. Turgeon’s evaluation of CP. Dr. Turgeon stated that when she interviewed CP, he scribbled a note to his mother. CP stated his note said: “Dear Mom, your son loves you. Mama, I love you. You love no other always love me. I give you a note every day because I love you. Please come back because I love you. Please.” CP dictated another letter that said: “You love me every day. You have to stay — Dear Mom, |7you love me every day. You have to stay calm, do stuff you need to do. If you don’t do it, I’ll never come to you. I’ll never see you again because you don’t do your job. Do the right thing.”
Dr. Benton was concerned that the mother had not followed up with medical *138 treatment for the fungal infection on CP’s head that he had diagnosed in an earlier examination on April 1997. Dr. Benton was also concerned about the neglect of the child’s extreme dental decay. CP’s foster mother, Ms. Vignes, testified that CP screamed when he ate and thought he had monsters in his teeth. CP gained nine pounds in one month after he was treated by the dentist.
Marcia Roome, the DSS/OCS case worker, testified that the case plan goal was for reunification of the children with KP. Ms. Roome stated that KP failed to take prescribed medication, to complete individual therapy, and to attend a sexual addiction group as recommended. KP lived in five different residences and failed to maintain regular employment until she started dancing. KP had completed the substance abuse treatment and parenting classes.
Ms. Roome described instances of KP’s parenting problems. KP did not maintain regular visitation with the girls. KP missed visits, came late, dressed provocatively, and brought Patrick and other friends to the visits. After CP was placed in DSS/OCS custody, under terms of the consent judgment, weekend visits with CP began in KP’s home.
KP took CP to buy a goldfish and returned with a boa constrictor for CP. KP got a pit bull puppy that bit CP’s ear. When she was told that the pet snake and pit bull puppy should not be there, KP testified that she got rid of them. During a visit when CP refused to give KP a hug, KP grabbed him and gave him a hickey on | «his chin and tried to give him one on his thigh. CP was afraid of KP’s boyfriend, Alvin Campo.
Ms. Roome testified that the foster mother picked up the girls from nursery one Friday evening, and the girls were sick. The foster mother took them to KP that night and told KP that the girls needed to go to the doctor. Ms. Roome related that KP treated them with over-the-counter medication, and the girls developed pneumonia. KP testified that she went to the store and asked the pharmacist for medication that Friday night. She did not take the children to the doctor but now knows that the doctor was available on a Saturday. There also was heavy rain that Saturday, and KP did not take the girls out in the rain but kept them inside and took care of them. She gave them Children’s Nyquil. KP thought that the girl’s foster mother could bring them to the doctor on Monday.
Ms. Roome noted that KP did not remove a glass table as requested. Ms. Roome and the YWCA counselor removed the table themselves. Ms. Roome observed that KPP was playing with a butter knife. Ms. Grabert, Ms. Vignes, and Ms. Roome each discovered the children unattended or unsupervised outside the home. The children reported roaches and dirt in the home.
CP called his foster parents during a visit, screaming that “Fat Mike” was chasing someone with a gun. Although there were allegations that “Fat Mike” molested CP, KP remained friends with him while the children were visiting her until KP was arrested in an incident with him in March 1998.
Dr. Mulry Tetlow, a psychologist, testified that he saw KP 29 times between October 1998 and May 1999. Dr. Tetlow opined that KP has a mixed personality disorder and is mentally ill. He testified that her lifestyle caused “situational stress” that had lessened. Dr. Tetlow stated that: “she is noticeably and 19significantly more mature than she was seven months ago.” He opined that if KP’s parental rights were terminated, the children would experience severe emotional damage. The children would perceive that their mother abandoned them. When he visited with the children and K.P., Dr. Tetlow found that the children “are really quite well bonded with her. They love her very much. They’re very affectionate towards her. They need her ...” Dr. Tet-low thought that “the sure emotional, se *139 vere and lasting damage done to the kids by simply not having their mother anymore is a greater risk to their welfare than being raised by her now.” Dr. Tetlow recommended that the children remain in foster care with on-going contact and supervision by DSS/OCS. He concluded that the mother should have visitation rights and should continue with individual therapy-

Issue of Whether Appeal Was Timely

On appeal DSS/OCS contends that KP’s appeal is untimely under La. Ch.C. Art. 332, which provides that appeals shall be taken within fifteen days. The trial court rendered its judgment on July 8, 1999, and the mother’s motion for appeal was filed on August 5, 1999.
La. Ch.C. Art. 332 provides in pertinent part:
A. Except as otherwise provided within a particular Title of this Code, appeals shall be taken within fifteen days from the signing of a judgment or from the mailing of notice of the judgment when required....
B. Notice of judgment, including notice of orders or judgments taken under advisement shall be provided in the Code of Civil Procedure, except no notice is required for counsel or parties not represented by counsel who are present when the judgment is rendered and signed. [Emphasis added.]
La. C.C.P. art.1913 states in pertinent part:
|inA. Notice of the signing of a final judgment, including a partial final judgment under Article 1915, is required in all cases.
❖ * *
C. Except as otherwise provided in Article 3307, in every contested case, notice of the signing of a final judgment, including a partial final judgment under Article 1915, shall be mailed by the clerk of court of the parish where the case was tried to the counsel of record for each party, and to each party not represented by counsel.
D.The clerk of court shall file a certificate in the record showing the date on which, and the counsel and parties to whom, notice of the signing of the judgment was mailed.
In State in Interest of K.B., 30,358 (La. App. 2 Cir 8/21/97), 698 So.2d 761, the appellate court held that the period of delay for appealing a judgment terminating parental rights is 15 days, and the provision of the Louisiana Code of Civil Procedure establishing a 30-day period of delay for taking a suspensive appeal does not apply to appeals taken from a judgment under the Children’s Code.
In the present case counsel for DSS/ OCS filed a motion to dismiss the appeal on October 20, 1999 in juvenile court. A hearing was set on the motion to dismiss the appeal on December 3, 1999. The record contains a docket sheet that provides dated entries. A hand-written notation on December 3,1999 states:
Mot[ion] for Dismissal of Appeal— Sherry Watters [sic], atty for State pres[ent]. Kim Jones, atty for [the mother KP] pres[ent]. Court marked said mot[ion] moot as per counsels [sic].
An appellate court may dismiss an appeal for lack of jurisdiction at any time on its own motion or on the motion of any party. Peters v. Life General Security Ins. Co., 392 So.2d 1054 (La.1981); Schenker v. Watkins, 521 So.2d 686 (La.App. 1 Cir.1988).
In the present case the trial was held in juvenile court on May 12, 13, and 14, 1999. In the July 8, 1999 judgment, the juvenile court ordered that the clerk of [^court “shall serve” each party (named separately) with a copy of the judgment through counsel. The record shows that the judgment and reasons for judgment were served on the following:
John F. Rowley, District Attorney, with service made on July 13, 1999, and “received” on July 14,1999; *140 Marcia Roome, DSS/OCS, with service made on July 13, 1999 and “received” on July 14,1999;
Faye Dysart Morrison, Attorney for the Children, with service made on July 13, 1999 and “received” on July 14, 1999; Lorna Perez, Attorney and Curator for Matthew Minslage/Roberts, father of CP, with service made on July 13, 1999 and “received” on July 14,1999;
Richard Tonry, Attorney for the Mother, with service made on July 13, 1999 and “received” on July 14, 1999;
KP, the mother, with service made on July 17, 1999 and “received” on July 16, 1999 [not clear];
Mark Jenkins, father of KMP, with service made on July 16, 1999 and “received” on July 20,1999;
Chad Roig, father of KPP, stamped on July 13, 1999 and “received” on July 23, 1999, with a notation that he had been “Released one (1) month ago.”
Sherry Watters, attorney for DSS/OCS, stamped on July 13, 1999, marked “filed” on July 30, 1999, and “received” on July 23, 1999 [not clear] and August 2,1999.
The record must reflect that the parties have been provided with notice of judgment by the clerk of court. Penalber v. Blount, 405 So.2d 1376 (La.App. 1 Cir.1981). In the absence of a proper, i.e., dated, notification to counsel of judgment having been signed, there was an uncertainty as to date, and such doubt had to be resolved in favor of the right to appeal the judgment and filing of a petition for sus-pensive appeal. Id.
With respect to motions for new trial, in H. B. “Buster” Hughes, Inc. v. Bernard, 306 So.2d 785 (La.App. 4 Cir.1975), aff'd. 318 So.2d 9 (La.1976), appeal after remand, 355 So.2d 1027 (La.App. 4 Cir.1978), this court found that two defendants cast in judgment might have different time limits because they received notice on different days. However, under La. C.C.P. art. 2087(C), with respect to devolutive appeals, when one or more parties file for new trial or judgment notwithstanding the verdict, the delay periods shall commence for all parties at the time they commence for the party whose motion is last to be acted upon by the trial court. A final judgment under La. C.C.P. art. 1911 differs from a definitive judgment under La. C.C.P. art. 1913. See Draper v. Draper, 554 So.2d 79 (La.App. 2 Cir.1989). A final judgment does not become definitive until the parties who are entitled to notice of judgment have received that notice. Bruce v. Hartford Life & Accident Ins., 907 F.2d 585 (5 Cir. (La.) 1990).
In the present case, the case was taken under advisement where the trial was in the middle of May and the judgment was signed on June 8,1999. The juvenile court ordered that all the parties shall be served. The return of service occurred on different days. Considering that doubts as to timeliness of an appeal are generally resolved in favor of the preservation of rights, the last date of service of one party is the proper date to trigger the 15 day time delay limit for an appeal to be filed by all parties. In the present case, it is unclear that Chad Roig was served. Further, Sherry Watters, attorney for DSS/ OCS, was served, stamped on July 13, 1999, marked “filed” on July 30, 1999, and “received” on July 23, 1999 and August 2, 1999. It appears that the return of service was filed by the clerk of court either on July 30, July 23, or August 2, 1999 for Sherry Watters. Considering that it is unclear whether the date is July 23, July 30, or August 2, 1999, the last date is August 2, 1999, which is the earliest date to trigger the beginning of the 15-day [ 1 ¿¡delay time for filing the appeal. Therefore, the mother’s appeal filed on August 5, 1999 was timely.

Issue of Termination of Parental Rights

At issue is whether the trial court erred in finding that the State proved that the mother’s parental rights should be terminated by clear and convincing evidence. *141 La. Ch.C. Art. 1015 provides grounds for termination of parental rights.
La. Ch.C. Art. 1015(3)(h) states:
(3)Misconduct of the parent toward the child or any other child in the household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency — including but not limited to any of the following:
(h) Abuse or negligence which is chronic, life threatening or results in gravely disabling physical or psychological injury or disfigurement.
La. Ch.C. Art. 1015(5) provides:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his needs for a stable and permanent home.
The State must prove that the best interest of the child dictates termination of parental rights. State in Interest of Four Minor Children v. D.W., 585 So.2d 1222 (La.App. 2 Cir.1991). Termination of parental rights is a severe and permanent action that must be scrutinized very carefully. State in the Interest of Z.D., 95-1680 (La.App. 4 Cir. 2/15/96), 669 So.2d 1312. The State must prove a case for termination of the natural parents’ rights by clear and convincing evidence. State | uin Interest of N.B., 599 So.2d 911 (La.App. 4 Cir.1992), units granted, reversed on other grounds 605 So.2d 1134 (La.1992). The Department of Public Services need only fulfill requirements under one applicable provision of La. Ch.C. Art. 1015; factual findings in a parental termination proceeding are subject to the manifest error-clearly wrong standard. State in Interest of V.T., 609 So.2d 1105 (La.App. 2 Cir.1992), writ denied 614 So.2d 1269 (La.1993).
La.Ch.C. Art. 1036 provides for proof of parental misconduct. Sections (C), (D), and (E) state:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-ordered approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the cost of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of harm, based upon expert opinion or based upon an established pattern of behavior.
*142 (2) A pattern of repeated incarceration of the parent that |1fihas rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based on expert opinion or based upon an established pattern of behavior.
E. Under Article 1015(6), a sentence of at least five years of imprisonment raises a presumption of the parent’s inability to care for the child for an extended period of time, although the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of his parental rights.
In State in the Interest of C.D., 558 So.2d 806 (La.App. 5 Cir.1990), the appellate court found that termination of parental rights was in the best interest of the child, noting that adults can take years to improve their functioning but children are not granted the same amount of time. Children’s lives are ’significantly disrupted while their parents are attempting to deal with their own problems.
In the present case, DSS/OCS contends if one of the grounds under La. Ch.C. Art. 1015(3) for termination of parental rights is proved, it is unnecessary to prove a failure to rehabilitate, and the term “substantial improvemenf’under Art. 1015(5) “has nothing to do with ‘misconduct’ under Art. 1015(3).” Both sections are under the same article. Section 5 of Ch.C. Art. 1015 provides another ground for termination of parental rights, i.e., no substantial compliance with a case plan, and no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future. Section (5) also provides for a time to bring a petition for parental rights termination, and is not just a separate ground for termination. If the reverse can be shown, that the parent substantially complied with a case plan, and there is a reasonable expectation of significant improvement |1fiin the parent’s condition or conduct in the near future, then this evidence can provide a rebuttal for all grounds for termination which include different acts of conduct, ie., misconduct, or neglect.
In State, in the Interest of G.A., 94 2227 (La.App. 1 Cir. 7/27/95), 664 So.2d 106, the appellate court found an absence of reasonable expectation of reformation in light of the continuous unwillingness of the mother to cooperate with the State and obtain substance abuse treatment, drug screenings, and counseling during periods of non-incarceration, which supported a termination of parental rights by clear and convincing evidence.
In State in the Interest of Latoya W., 97-0695 (La.App. 4 Cir. 2/4/98), 706 So.2d 688, the mother was unfit to retain parental control and provided no basis for reasonable expectation of reformation in the foreseeable future. This supported termination of parental rights because she was unable to stop her crack cocaine habit despite various drug treatment programs, she worked as a prostitute, stole children’s toys, and had no source of income or place to live.
In State in Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, appeal after remand sub nom. State ex rel. S.M., 99-0526 (La.App. 4 Cir. 4/28/99), 733 So.2d 159, unit denied, 99-2127 (La.7/21/99), 747 So.2d 36, the Louisiana Supreme Court reversed this Court’s finding that the mother’s parental rights should not be terminated because she cooperated with the case plan. The Supreme Court noted that the child has an interest in termination of parental rights that prevents adoption and inhibits that child’s establishment of secure, stable, long term, continuous family relationships. The Supreme Court held that proof of the parent’s cooperation or compliance with the case plan was not sufficient. The [17juvenile court must also assess whether the parent showed im *143 provement by altering or modifying in a significant way the behavior that served as a basis for the State’s removal of her child from the home. State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993); State in the Interest of D.T. v. K.T., 29,796 (La.App. 2 Cir. 6/18/97), 697 So.2d 665.
In State in Interest of S.M., supra, an emergency call brought the police to the home because the three-year-old child was not breathing. He was unconscious, had bruises and welts all over his body, and two black eyes. It appeared that the mother’s boyfriend was responsible for inflicting the injuries but the mother did not prevent the beatings and was therefore neglectful. The other two children were examined and had been physically abused repeatedly. The mother entered a plea of guilty to three counts of cruelty to juveniles for which she received a suspended sentence and placed on five years active probation. The sentencing court required the mother to serve 12 months imprisonment with the Department of Corrections, earn her graduate equivalency diploma (GED), and obtain vocational technical school training. She served nine months of her sentence.
In State in Interest of S.M., id., Dr. J. Steven York, a clinical psychologist, stated that the mother did not believe that she could handle all three children, and she expressed that it was best for her three children to remain in foster care. Although she completed a parenting program, a battered women’s program, and a GED program, she attended three psychotherapy sessions but she resisted continuance of the sessions. Because of her unwillingness to attend, the therapist canceled further sessions. The only job that the mother ever had was at McDonald’s until medical problems caused her to quit. She was pregnant with l1Rher fourth child (who was not involved in the ongoing juvenile court proceedings). The reports from the health professionals and social workers that evaluated the mother, found that she did not make progress toward changing her conduct that led to the abusive injuries of the children. The reports showed that the evaluators were against the reunification plan and expressed grave concern for the children’s welfare if the reunification plan were approved. In meeting with one of the boys, a clinical psychologist intern recorded that the son expressed anger and fear toward his mother for his own abuse and the abuse of his younger brother. The same intern noted that the mother spanked the child during a supervised visit.. Her report expressed great concern about how the mother is likely to respond to the son during more stressful situations. She stated that “contact with [the mother] causes [the son] intense psychological distress, physiological reactivity, and he feels as if the abuse were reoccurring ...” Id., 719 So.2d at 452.
In that case, the Louisiana Supreme Court determined that the juvenile court abused its discretion in accepting DSS/ OCS’s proposal for reunification in its permanency placement plan. The Supreme Court did not terminate the mother’s parental rights but remanded the case to the juvenile court for an expeditious hearing to decide on a permanency placement plan and/or petition for the termination of the mother’s parental rights as well as any related issue. The Supreme Court also ordered that any appeal would also be heard within a designated time period.
The above case and the present case have similarities in that the mothers both had changed residences frequently, had unstable relationships with men, and the children had different fathers. The mothers were found to be immature. Both | ^mothers loved their children. However, the cases differ.
In the present case although KPP was injured, there is no conclusive evidence that her injuries were gravely disabling either physically or psychologically. The State did not show by clear and convincing evidence that the actions or inactions of KP constituted extreme abuse, cruel and *144 inhumane treatment or grossly negligent behavior below a reasonable standard of human decency. Although there was neglect, it did not compare with the evidence of the abuse shown in State in Interest of S.M., id. Further, the children in State in the Interest of S.M. feared their mother, and the opinion does not reflect that they loved her. In the present case, the record does not show that the children are afraid of their mother or do not want to be with her. The record indicates that the children and KP love each other.
KP substantially complied with DSS/ OCS. Ms. Eva Moore, a children’s aid at Chalmette Schools, a Social Worker and director of the St. Bernard Substance Abuse Clinic, testified that KP attended the abuse clinic not only for the 24 weeks required, but for 34 weeks. Although 50 meetings were required for Group Therapy, AA Meetings, SAA Meetings and Intensive Out Patient Treatment, KP attended 72 meetings. She submitted to daily breath analysis as well as frequent and random drug screening. KP was found to be alcohol and drug free.
Ms. Marilyn D. Robertson, co-director of parenting classes at the YMCA, testified that KP completed the parenting classes twice. KP had perfect attendance at both courses. While the average was 6.5, KP scored 7 in the first course and 9.5 in the second course. There is substantial indication that KP has followed DSS/OCS’s program. She improved the scheduled visitations with the children. 12nPr. Tetlow found that KP made marked improvement, her children are safe with her, she has gained in maturity, and she will not repeat her mistakes of the past. There is reasonable expectation of KP’s reformation or at least significant progress toward KP’s assumption of responsibility for the children in the foreseeable future. All agree that KP has a great love for her children. It is very significant that the children love their mother. Considering Dr. Tetlow’s testimony, the mother showed improvement by altering or modifying in a significant way the behavior that served as a basis for the State’s removal of her children from the home. We find that it would be in the best interest of the children for the mother to remain in their lives. The juvenile court was clearly wrong in terminating KP’s parental rights under the totality of circumstances.
In State in Interest of D.G. v. Danny G., 30,196 (La.App. 2 Cir. 10/29/97), 702 So.2d 43, the appellate court affirmed the trial court determination that a permanent plan of long-term foster care was in the best interest of the children. The appellate court found that the juvenile court did not abuse its discretion by determining that the permanent plan of long-term foster care was in the best interests of twin boys, rather than termination of the parental rights of the mother and father, even though the juvenile court found that two statutory grounds for termination had been established by clear and convincing evidence. The appellate court noted that the juvenile court’s determination that the elements of the statutory subsection for termination of parental rights had been proved; however, that determination does not inherently satisfy the additional requirement that the termination of parental rights is in the best interest of the child or children.
In Stale in Interest of S.D. v. Moore, 31,192 (La.App. 2 Cir. 8/19/98), 717 h. So.2d 265, the appellate court held that if statutory grounds for termination of parental rights are proved, then ordinarily termination will be in the best interest of the children; however, the best interest determination allows the court in an exceptional case to refuse to terminate, even after proof of statutory grounds.
At the trial in the present case, the juvenile court noted that under federal guidelines, the federal government does not condone long-term foster care. Because' the mother and children love each other, and considering the severe and lasting emotional damage to the children that would result from the termination of the *145 mother’s parental rights, this is an exceptional case where it would be in the best interest of the children that the mother’s parental rights should not be terminated. However, it would not be in the best interest of the children to be reunited immediately with their mother, KP. Therefore, the children should remain in foster care with visitation with their mother, KP.
Accordingly, the judgment of the trial court is reversed in part, and the State’s petition for termination of parental rights is denied as to the mother, KP. The children are not eligible for adoption. For the present the children are to remain in the custody of DSS/OCS, in foster care, allowing visitation with KP and individual therapy for the mother. The case is remanded to the juvenile court for further proceedings, including the determination of whether a permanent placement plan of long-term foster care would be in the best interest of the children.

REVERSED IN PART & REMANDED.