| .WILLIAM H. BYRNES III, Chief Judge.
STATEMENT OF THE CASE
On September 5, 2002, the State of Louisiana, Department of Social Services, Office of Community Services (OCS) filed a petition to terminate PC’s parental rights with respect to three of her four surviving minor children[1], AMW, born July 22,1991; ALW, born September 16, 1992, and JRW, born August 21, 1993. No father is listed on the birth certificates for AMW and ALW. Alfred Searls is alleged to be their biological father, although he is alleged to have taken no action to acknowledge paternity, to enroll in the putative father registry or otherwise record his paternity of these children. He is alleged to be incarcerated in Federal Prison, although his current location is uncertain. No father’s name is given on JRW’s birth certificate. Jimmy Carmouche is alleged to be JRW’s biological father, but has likewise taken no action to acknowledge or record his paternity. He currently resides at a known address in New Orleans. A DNA test performed by the Reliagene Technologies, Inc. laboratory demonstrated that he is not JRW’s biological father. No other person has taken any action to claim paternity of AMW, ALW or JRW.
DOCS seeks termination of the parental rights of the children’s father(s) for abandonment pursuant to LSA-Ch.C. art. 1015(4).
OCS similarly seeks termination of PC’s parental rights, alleging that she aban *578 doned the children, having left them under circumstances demonstrating an intention permanently to avoid responsibility by:
1/ having failed to provide significant contribution to their care and support for more than six consecutive months from January 7, 2002 to August 28, 2002;
2/ having failed to maintain significant contact with the children by visits or communication with them for the same period. This lack of contact includes failure emotionally to support the children, to contact them on their birthdays and holidays, to provide cards, gifts, clothing or letters for the children, or to contact them in person, by phone or in writing. Furthermore, PC failed to make or maintain contact with OCS or to inquire about the children’s well being or to assist in planning for their future since January 7, 2002. PC has not completed the court-mandated case plan for reunification with her children.
OCS obtained appointment of curators to represent the interests of the absent father(s).
The trial court set the termination petition for adjudication and set times for the parents’ answers to be filed and for a scheduling conference.
The record contains a certification by a representative of the Times-Picayune Publishing Corporation that an advertisement ran on September 7, 8 and 9, 2002 asking information concerning the whereabouts of Alfred Searls and the father(s) of the three children. The record also contains certificates from the Putative Father Registry showing no requests or applications for listing relative to the birth of any of the three children. Also in the record are certificates of the clerk of Orleans | ¡¡Parish Juvenile Court that no Act of Acknowl-edgement, Judgment of Filiation or Legitimation by Authentic Act had been filed with respect to any of the children.
PC answered the OCS petition with a general denial on information and belief and claimed that the allegations do not constitute just statutory cause for termination of her parental rights and, alternatively, that termination would not be in the best interests of her children.
OCS issued subpoenas to PC, to the children’s foster mother, Joycelyn Harold, and to OCS case manager Karen Pierce to compel their attendance at trial. PC filed a trial witness list consisting of OCS contractors Antonia Moore, Ms. Pierce, Ms. Harold, Dr. Ron Cambias and Linda Nelson. By amended order she sought service on those named in her witness list as well as on Dr. Donald Schexnayder.
The trial court conducted a hearing on September 17, 2002 at which PC, her counsel, the fathers’ curator, counsel for the children, counsel for OCS, Ms. Pierce and OCS court liaison Brigitte Cottrell were present. The trial court noted that DNA testing excluded the possibility that Mr. Carmouche was JRW’s father and required PC to execute an affidavit stating the identity of the father(s) and to submit the affidavit to the court no later than September 19, 2002. The court set the matter for scheduling conference on October 11, 2002 and for termination adjudication hearing on October 23, 2002.
Prior to trial, witness Linda K. Nelson, LCSW, filed a letter to PC’s counsel advising him that his firm was to bear the cost of her court appearance.
According to the pre-trial order, PC intended to introduce certified medical records of her September, 2002 hospitalization at Ochsner Medical Foundation and [4a time line with reports of treatment provided to PC and her children by Dr. Schexnayder, Dr. Cambias, Ms. Moore and Ms. Nelson.
*579 The fathers’ curator ad hoc filed a report showing his diligent albeit unsuccessful effort to ascertain the whereabouts of the fathers.
The adjudication hearing was held on October 23, 2002, before the juvenile judge. During the course of the hearing and immediately following the testimony of licensed clinical social worker Linda K. Nelson, the trial judge said:
You’ve been called as an expert witness. Send your bill, please, to Mr. Cohen and his client, because he’s the person who called you.
Counsel for PC objected on the grounds that the court had found PC to be indigent, to which the trial court replied that the indigency determination had been made in the previous child in need of care case, and that PC had not filed a motion to proceed in forma pauperis in the instant case. Counsel complained that the court’s ruling “tarnished” the defense case, to which the court replied that the defense witnesses were available and had been subpoenaed. The court told counsel, “It’s up to you to file what has to be filed, Mr. Cohen, and I find that you did not do that.... I’m trying to accommodate you and your witnesses. Is there any other witness that you want to call out of turn at this time?” Counsel replied, “No, your Honor.”
After the OCS rested, the trial judge asked counsel for PC if he wished to call any witnesses. Counsel said:
... I called Dr. Schexnayder and notified him that we would not be needing him today, based on this Court’s ruling ... regarding fees, and the only evidence that I have to introduce in addition to that are |scertified copies — or a certified copy of the medical records from [PC’s] hospitalization in September of this year.
The trial judge then questioned PC’s counsel concerning his decision not to call Dr. Schexnayder. PC’s counsel replied, “Because I’m not in a position to pay his fee. I can’t in conscious [sic], call him and have him testify and expect, you know, him not to receive payment for that, and I can’t pay him.” The trial court advised counsel that he had the right to appeal or take writs from the ruling concerning payment of expert fees and did not accept counsel’s excuse as a legitimate reason for failing to call the witness.
The trial court then questioned counsel concerning the indigency question. During the questioning, counsel admitted that he had filed no pleadings in the instant case seeking a determination of indigency, that PC was gainfully employed in an assistant managerial position, and that PC had not completed an indigency application in the instant case. The court advised counsel that he believed counsel’s failure to have complied with applicable procedures for making a claim of indigency would make an appeal or application for supervisory review of the trial court’s determination that PC could not proceed in forma pauperis and was responsible for payment of expert witness fees to be frivolous. Again, the court asked counsel if he wished to call additional witnesses, to which counsel replied in the negative.
OCS counsel advised the court that she had not been furnished a copy of the medical records, objected to their introduction and objected to the introduction of the medical records connected to PC’s September hospitalization. Counsel contended that she had not had an opportunity to review them or to cross-examine the witnesses who prepared them. PC’s counsel alleged that he had not received | fithe records until the previous night, whereupon counsel for the children noted that she could have reviewed the records during *580 the morning had they been provided prior to commencement of the hearing at one o’clock in the afternoon. PC’s counsel replied, “I apologize to the Court and to other counsel. I have no explanation.... I apologize to the Court and the State for not providing them immediately.” The trial judge ruled that because PC’s counsel had ample opportunity to have the records copied and supplied to the court and other counsel, he would not allow the records into evidence at that time. The records were identified as records dated October 22, 2002, of PC’s hospitalization at Ochsner Clinic Foundation’s hospital.
Following the adjudication hearing on October 23, 2002, the trial court rendered judgment finding that the Department of Social Services had proved the allegations of the petition to terminate PC’s and the father(s)’ parental rights by clear and convincing evidence, and that termination of parental rights is in the children’s best interests, welfare, health and safety. The Court ordered that all parental rights and obligations of PC, Alfred Searls and any and all unknown and/or unidentified fathers) of AMW, ALW and JRW, be totally and irrevocably terminated and dissolved, pursuant to Louisiana Children’s Code Article 1015. Furthermore, the trial court declared the children to be free and eligible for adoption pursuant to the law. The Department of Social Services was granted continued care, custody and control of the children and was ordered to furnish this Court with a written plan for the permanent placement of the children within ninety 17(90) days of this judgment pursuant to LSA-Ch.C. Art. 1040. From this judgment, PC appeals. We affirm.[2]
STATEMENT OF FACTS
Because this termination of parental rights case is related to the previous child in need of care case, we begin with the statement of the background of this litigation from the earlier case, State of Louisiana in the Interest of J.W., A.W., 2000-1445 pp. 1-2 (La.App. 4 Cir. 1/10/01), 779 So.2d 961, 963-964:
On 16 October 1998, R.C., the two year old and youngest child of P.C., was brought to the hospital after emergency help was summoned through 911 operators. She subsequently died of severe injuries. Upon arrival at the hospital, she was diagnosed with a skull fracture and other injuries which appeared to be the result of a severe beating. The Office of Community Services was called. P.C. has four older children. These children remained with their mother until 14 January 2000. The four children were placed together in the home of a certified foster parent. After several hearings the trial court found the four children in need of care and ordered that OCS/DSS retain custody and that the children remain with the foster parent. The mother appeals this *581 finding and the trial court’s judgment, dated 28 March 2000.
After an autopsy, the coroner determined that R.C. died from battered child syndrome. He testified that she had suffered a skull fracture, six separate areas of hemorrhage on the scalp, five separate root fractures to the back portion of the |sleft and right sides (rib fractures), retinal hemorrhage, extensive hemorrhage in both buttocks, old hemorrhage in the lower back, multiple abrasions and bruises of the back, the buttocks and the legs, and massive bruising to the groin area. The coroner, Dr. Michael B. Defatta, testified that R.C. suffered these extensive injuries over a significant period of time, that the injuries were in various stages of healing, that the skull fracture alone had been inflicted days, perhaps a week, before R.C. died. He also testified that he believed these injuries were clearly noticeable by anyone caring for the child, that the child suffered extreme pain and discomfort before her death, that R.C. would have suffered obvious symptoms, including loss of consciousness and trouble breathing. Dr. Defatta believed that the injuries clearly resulted from someone beating the child severely for a long period of time.
The mother, P.C., and her boyfriend, W.W., who lived with P.C. and her children at the time of R.C.’s death, were charged in the death of R.C. Eventually, P.C. pled guilty to a charge of cruelty to a juvenile and agreed to testify against W.W. She was placed on probation in connection with this plea.
Various witnesses testified that P.C. stated that she knew W.W. beat her children, that she knew R.C. had lost consciousness days before her death, that she knew the child was having trouble breathing days before her death, and that she had not sought medical attention for her obviously injured child. Moreover, these witnesses testified that P.C. continued to leave her small children with W.W., although she knew he beat her children.
P.C. suffers from battered women’s syndrome, according to the testimony of her therapist. She has been in numerous abusive relationships, including her relationship with W.W. Her therapist testified that P.C. has a hard time standing up to the abusive men in her life to defend herself or her children. Witnesses testified that P.C., after R.C.’s death, allowed a man, with an extensive criminal history, close and unsupervised contact with her children. [Footnotes omitted.]
|9In affirming the judgment of the juvenile court finding the children to be in need of care and placing them in OCS custody, this Court held:
The trial court’s determination in a child custody case is entitled to great deference. The trial court’s decision will not be reversed on review except in the clearest case of abuse of the trial court’s great discretion. State of Louisiana in the Interest of M.L., 611 So.2d 658, 660 (La.App. 4 Cir. 8/27/92). [PC] does not argue that the trial court misapplied the law. She argues that the state did not prove the case with sufficient evidence.
LSA-Ch.C. art. 602 provides that for the trial court to find that the children were “in need of care,” the children were the victims of “abuse” or “neglect.” These conditions must be proven by a preponderance of the evidence. LSA-Ch.C. art. 665.
From the record, we cannot conclude that the mother actually beat R.C. before her death. However, that determination is not necessary to affirm the trial court’s finding that the *582 four children are in need of care. P.C. admitted that she knew W.W. abused her children, but she repeatedly allowed this man control over R.C., a defenseless child, and the four older children. She continued to protect him after R.C. died. Moreover, P.C. knew that R.C. had suffered serious injury, but she never sought medical attention for the child. P.C. had three prior OCS referrals, two for abuse by her boyfriends and one for neglect. We do not believe that the trial court erred in finding P.C.’s children in need of care.
State ex rel. JW, AW, AW and JW, at p. 4, 779 So.2d at 964.
At the termination hearing, PC testified that she is the mother of the surviving children who are the subjects of the termination hearing. She testified that her children entered foster care on January 14, 2000, and admitted that OCS developed a case plan for the children that included child support and visitation. By January 2002, PC was allowed liberal, unsupervised overnight visitation with |inthe children. She testified that she failed to contact the three children since January 7, 2002, because of “depression.” When asked what she has done to try to alleviate this depression, PC said she went back to see Dr. Cambias in late summer of 2002. She made two appointments with Dr. Carmel Palazzo early in the year, and admitted that she failed to attend either of those appointments. PC also admitted that in spite of this “depression” that caused her to abandon her children, during the period of that abandonment she continued to work full time, including frequent double shifts, as assistant manager of a fast-food restaurant, had a Super Bowl party at her house, visited friends and neighbors, kept her house clean, and had people visit her at her home. PC also admitted having called Ms. Pierce concerning the son of whom she has custody to ask for a tuxedo and school uniforms. She admitted that the children in foster care wrote letters to her asking her to visit them, to which she did not respond. PC admitted she had paid no child support during the applicable time period, contending she did not have the $20 weekly payment.
On cross-examination, PC admitted that she felt responsible for not having seen her children for a significant period of time and that she feels she is an unfit parent. She recalled having been advised by the trial judge in November of 2001 that the children could live with her if and when that placement was determined to be in the children’s best interest. She admitted that she had done virtually nothing between November of 2001 and March of 2002 in order to achieve reunification with her family, although she recalled having been encouraged by the juvenile court judge to begin compliance so that the children could come to live with her. She admitted that the judge told her that if she did not visit with the children her parental rights could be terminated. She also admitted that because of the liberal | n visitation provisions of the plan, her work schedule could be accommodated readily.
Joycelyn Harold, the children’s foster mother, testified that she has served as such for an uninterrupted period of almost three years. During the period of January 7, 2002 through August 28, 2002 neither PC nor Mr. Searls visited or called the children, nor did either of them send the children letters, cards, gifts or clothing. Neither PC nor Mr. Searls paid Ms. Harold child support or gave her clothing or food for the children during that time period.
Linda K. Nelson was qualified as an expert in the field of clinical social work. *583 She testified that on January 26, 2000 (approximately fifteen months after RC was killed) she diagnosed PC with an Axis I diagnosis of major depression and post-traumatic stress disorder.
In August 2001 Ms. Nelson noticed signs of depression in PC. PC had been doing well and had no longer needed anti-depressant medication. In October, PC complained of depression and that her boss had been giving her trouble. PC attributed her problems at work to the fact that her boss was not cooperating to allow her to attend her therapy sessions with Ms. Nelson. In December 2001 Ms. Nelson sent a fax to Ms. Pierce of OCS recommending that PC see a psychiatrist to assess whether she should be placed on medication for her depression.
Ms. Nelson testified concerning her observations of PC during the relevant time period set forth in the petition, between January 6, 2002 and June 6, 2002. On March 25, 2003 and April 4, 2003, she saw PC and PC appeared to be very depressed.
On cross-examination by OCS counsel, Ms. Nelson testified that she did not know if PC had problems at work or if PC was taking anti-depressant medication |i;,when she appeared depressed on March 25 and April 4, 2002. According to Ms. Nelson, PC told her on March 25, 2003, that she was depressed and that she feared that if she had custody of the children she wouldn’t make the right decision and would not be able to take care of them financially. PC also expressed depression because the children sounded happy in their foster home.
On cross-examination by the children’s counsel, Ms. Nelson testified that when she first began treating PC in December 1999 she diagnosed PC as having an Axis II dependent personality disorder. At the time of the child in need of care case Ms. Nelson testified that PC minimally fulfilled the requirements for that diagnosis. Indeed, she testified in the instant case that she agreed with Dr. Cambias that PC suffered from a personality disorder NOS (not otherwise specified). None of these diagnoses were so severe as to make PC disabled.
On re-direct examination, Ms. Nelson said that she diagnosed PC with major depression when she performed her initial evaluation in December 1999, which was alleviated toward the middle of 2001 to the point that PC did not seem to require antidepressants. The depression recurred, “somewhere around, my guess” August to September of 2001. Ms. Nelson opined that PC could be treated for her depression. She noted that when taking antidepressants, PC seemed to progress in her decision-making. Once she got off the medication, her decision-making remained “pretty good”, and when the depression came back, PC’s decision making was faulty. The cause of the return of the depression was a combination of lack of medication and the pressures of the anniversary of her daughter’s death and PC’s work environment.
Karen Pierce, a caseworker in the OCS Foster Care Program, testified that she maintained the children’s case record and monitored compliance and progress 113with the case plan. She testified that to the best of her knowledge, Alfred Searls, a prisoner, is the father of ALW and ARW. She had no knowledge of who might be JRW’s father.
According to Ms. Pierce, a case plan was in effect from January 7, 2002 through August 28, 2002 with the initial goal of family reunification and termination adoption. She talked with PC about unlimited visitation if PC were unable to get days off during the weekend so that PC could have the children overnight, provided PC made *584 sure they went to school the next day. To Ms. Pierce’s knowledge, PC’s last visit with her children was during a therapy session with Linda Nelson on January 7, 2002. To her knowledge, PC provided no cards, gifts, clothing or letters to her children from January 7, 2002 through August 28, 2002. This time frame included the birthdays of two of the children. PC did not call Ms. Pierce during that time frame to inquire about the three children who were still in foster care, although she had contact with Ms. Pierce several times a month. These contacts were initiated at times by PC and at times by Ms. Pierce. Each call initiated by PC had reference to the child who was in PC’s custody and who is not a subject of this instant litigation.
During a discussion in March of 2002 Ms. Pierce told PC she hoped PC would be able to visit the children when they were out of school for their Carnival holiday. PC responded that OCS expected her to run around to different appointments and her employer was not being cooperative. Ms. Pierce responded by noting this might be a reason to have discontinued therapy but does not explain why PC has not visited the children, since there were no time restrictions on visitation and PC could have unsupervised visits at any time. PC responded that her car needed an alignment and therefore she could not drive on the interstate.
| uMs. Pierce verified that during the applicable time period PC did not pay any child support or provide food or clothing for the children. PC failed to attend any of the administrative reviews to which Ms. Pierce had invited her. When Ms. Pierce visited PC’s home, the house was always clean, neat and orderly. Ms. Pierce often saw PC out in the neighborhood, visiting neighbors during the applicable time period. PC told Ms. Pierce that she had hosted a Super Bowl party during the relevant time period. Ms. Pierce testified that PC’s phone was disconnected in January 2002 and was reconnected with a new number by February 6. PC did not ask her to give the new phone number to her children.
Ms. Pierce testified that she sent a packet of information together with an Incarcerated parent form to Mr. Searls, who returned the form. A later packet sent to Mr. Searls was returned with the notation that he had gone from the Texas federal prison to another prison in Florida. She re-mailed the material to Florida after August 28, 2002. During the relevant period, Mr. Searls did not pay child support for ALW or ARW or provide cards, gifts, clothing or letters. Other than returning the Incarcerated Parent Form, he has not contacted Ms. Pierce or visited or telephoned the children during the time the children have been in foster care. To Ms. Pierce’s knowledge, no one legally has acknowledged paternity or claimed to be the father of any of the three children.
Ms. Pierce testified that she became aware of PC’s depression during a visit in fall of 2001 on the anniversary of the murdered child’s death, at which time she arranged for PC to have a weekend visit with her children. In December 2001 PC again complained of depression, and advised Ms. Pierce that she had not taken the children for their Thanksgiving holidays but had visited them once during that vacation. PC did not visit the children during the Christmas holidays, claiming she liRwas depressed. PC asked to go back on anti-depressant medication, and Ms. Pierce contacted CEP to request approval. Ms. Pierce then asked Ms. Nelson to make her recommendation in writing, and a visit to PC’s former psychiatrist, Dr. Schexnayder, was approved. When CEP reached the doctor, he declined to take PC back as a patient, so that the agency selected Dr. Carmen Palazzo to treat PC. *585 Although Ms. Pierce advised PC of Dr. Palazzo’s selection, PC never saw the doctor. In April 2002 PC explained she had not seen Dr. Palazzo because she no longer wanted to take anti-depressant medication because of the way it made her feel.
According to Ms. Pierce, the agency considered the children’s best interests in making the decision to terminate PC’s parental rights and place the children for adoption. After having spoken with the children, Ms. Pierce did not feel it was necessary to reassess the termination/adoption plan.
Dr. Ronald Cambias, Jr. was stipulated to be a qualified expert in the field of psychology and testified that he evaluated PC in April or May 2001 and again in summer of 2002. When he met with PC in August of 2002 she seemed severely depressed according to the Beck Anxiety Inventory. It was unusual that PC was able to hold down her job although she seemed to be severely depressed. He testified that PC has a certain degree of choice as to her depression, but that it is hard to draw a line in terms of how much of her action is under the influence of depression and how much is under her free will. PC told Dr. Cambias that although her medication helped her, she stopped taking it because she felt it made her too agreeable and she felt that if she continued on her medication she would “let her guard down” and be taken advantage of. PC wanted to be “hyper-vigilant.” According to Dr. Cambias, PC’s primary reason for failing to cooperate |1fiwith the case plan was not depression, but rather her lack of trust of the agency and the providers. Dr. Cambi-as testified to two concerns about reuniting PC with her children in April 2001: first that she would be too depressed to care for the children, and second that she was not in compliance with her treatment plan. PC was not in the position to be a good parent in August 2002.
On cross-examination, counsel for PC asked Dr. Cambias if PC’s failure to contact the children during the relevant period could be attributed to her concern that they not be harmed by seeing her in her depressed condition. Dr. Cambias testified that if that were the case there remained alternative means of keeping contact with the children, such as letters and other forms of communication. PC did not avail herself of any of these alternative methods of contacting her children.
On cross-examination by Ms. Dowling, Dr. Cambias testified that he did not believe that post-traumatic stress disorder was the reason PC did not visit the children during the relevant time period. Furthermore, PC faded to attend the last couple of authorized sessions with Dr. Cambias. He testified that if PC continued to refuse medication and treatment for her depression, the prognosis for her recovery from her depression would be poor. Dr. Cambias testified that he did not believe that PC’s decisions to refuse treatment and medication to alleviate her depression were beyond her control.
Based on this testimony, the trial judge found the following facts:
1. There is clear and convincing evidence that Mr. Searls has not supported his children, nor has he had any contact with them.
2. As to the unknown father(s), the absence of notation in the Putative Fathers’ Registry and the Clerk’s Certificate of No Acknowledgement of an | ^Illegitimate Child provide clear and convincing evidence that those father(s) have abandoned the children.
3. There is clear and convincing evidence that PC abandoned the three children at issue in this litigation. Although she had a responsible, managerial job, entertained at home and associated with her neighbors, she made no support payments *586 and failed to send them Christmas or birthday cards or gifts. She failed to respond to letters the children wrote to her and failed to visit them although the court allowed liberal visitation.
4. For over six months she demonstrated her intention permanently to avoid parental responsibility for the children.
5. PC failed to prove an affirmative defense of just cause under La.Ch.Code art. 1035(B). PC’s own witness, Dr. Cam-bias, testified that based on his contacts with her in April 2001 and three times in July and August 2002, her lack of trust, and not her depression, was the primary cause of her actions. PC chose to discontinue her therapy and her medication without just cause. She failed to contact or support her children during the relevant period of time without just cause.
6. The Ochsner hospital record offered by PC’s counsel is irrelevant since it came after the relevant time period and was not offered in connection with the testimony of any witness.
7. The State proved by clear and convincing evidence that termination of PC’s parental rights is in the best interest of the children.
These factual findings of the juvenile court judge in a parental termination proceeding are subject to the manifest error/clearly wrong standard of review. State ex rel. C.P., 2000-0953 p. 14 (La.App. 4 Cir. 6/28/2000), 768 So.2d 134, 141, reversed on other grounds, 2000-2703 (La.1/17/01), 777 So.2d 470.
FIRST ASSIGNMENT OF ERROR: Termination of parental rights based upon a parent’s medically diagnosed depression is improper and unconstitutional.
A parent claiming her mental or medical condition caused an abandonment of her children within the meaning of La.Ch.Code art. 1015(4) has the burden of proving this affirmative defense under La. Ch. Code art. 1035(B) by a preponderance of the evidence. State in the Interest of ML, 95-0045 p. 9 (La.9/05/95), 660 So.2d 830, 834.
Because even a less than model parent has a natural, fundamental liberty interest in the parent/child relationship, termination of parental rights requires adherence to the due process safeguards, including notice and an opportunity to be heard. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); State in the Interest of J.A., 99-2905 (La.1/12/2000), 752 So.2d 806. In order to terminate parental rights, the State has the burden of showing by clear and convincing evidence at least one of the statutory grounds for termination and that the termination is in the best interest of the children. See State in the Interest of ML, supra p. 4, 660 So.2d at 832.
The State has pointed out its responsibilities under the Adoption and Safe Families Act of 1997, 43 U.S.C. § 601 et seq. The federal act took effect on November 19, 1997 and was therefore applicable to this case. The act recognizes the children’s need for a stable home and requires the State to initiate termination of parental rights proceedings when a child has been in foster care for fifteen of the |T9past twenty-two months absent compelling contradictory reasons. These children had been in foster care for more than two years at the time the State initiated this termination proceeding and we find from the record taken as a whole an absence of compelling reasons to justify a lack of action by the State.
Clearly, a goal of both the federal act and of the applicable provisions of the Louisiana Children’s Code is to more expeditiously insure health, safety and permanence for children in foster care. Our jurisprudence confirms that the best interest of children must outweigh parental rights.
*587 More than simply protecting parental rights, our judicial system is required to protect the children’s rights to thrive and survive. Furthermore, a child has an interest in the termination of rights that prevent adoption and inhibit that child’s establishment of secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to insure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. [Footnotes omitted.]
State in the Interest of S.M., 98-0922 pp. 14-15 (La.10/20/98), 719 So.2d 445, 452.
This assignment of error presupposes that the evidence supports a finding that the termination of PC’s parental rights was based upon her medically diagnosed depression. The record as a whole supports the trial court’s conclusion, based on uncontroverted expert medical testimony, that PC’s depression was at least in part volitional, could have been treated had she cooperated in taking her medication and attending her psychiatric appointments, and, in any event, was not the primary cause of her failure to contact, support or communicate with her children. This assignment of error is without merit.
J^SECOND ASSIGNMENT OF ERROR: The trial court’s mid-trial ruling that P.C. would have to pay the State’s experts to testify concerning her depression deprived her or a fair proceeding and due process of law.[3]
The record contains PC’s application dated October 31, 2000, for pauper status in an earlier proceeding, together with the trial court’s order of November 3, 2000 granting the application. The trial court denied PC’s motion to file the instant appeal in forma pauperis on November 6, 2002. PC applied for supervisory review in this Court and by writ disposition in 2002-C-2323 a divided panel of this Court granted the application, affirmed the trial court’s judgment that the earlier pauper designation did not carry over to the instant case, and remanded the case to juvenile court to allow PC to file a written motion to proceed with her appeal in for-ma pauperis, along with a current supporting affidavit.
On remand, PC filed a new affidavit in support of her pauper status and on January 29, 2003, the trial court held a hearing on that issue. Based on the testimony taken at the hearing and on PC’s affidavits in this and in the earlier proceeding, the trial court denied pauper status. PC applied to this Court for supervisory review and on April 8, 2003, a unanimous panel denied her writ application.
There is no evidence or suggestion in the record that PC’s financial situation deteriorated since this Court found she did not qualify for pauper status.
We also note that PC claims only that the denial of pauper status resulted in her failure to call Dr. Schexnayder at trial. Accepting as true PC’s claim, the fact | ¡^remains that Dr. Schexnayder most recently evaluated PC in September of 1999, prior to the relevant period.
This assignment of error is without merit.
THIRD ASSIGNMENT OF ERROR: There was insufficient evidence to warrant termination of PC’s parental rights.
Prior to terminating a parent’s rights on the grounds of abandonment, the court *588 must inquire into the intention of the parent while considering the totality of the circumstances. State v. State in the Interest of Moore, 474 So.2d 478 (La.App. 4 Cir.1985); State in the Interest of Hodges, 459 So.2d 634 (La.App. 5 Cir.1984).
Our review of the record in its entirety convinces us that the trial court correctly found that the State offered clear and convincing evidence, largely uncontrovert-ed, warranting termination of the parental rights of PC, Mr. Searls and any other unknown father(s) of the children. The fact witnesses and the experts agree that PC failed to contact, support or communicate with her children for a period of over six months’ duration. The statutory basis for termination having been amply demonstrated by uncontroverted evidence, the burden fell on PC to prove the affirmative defense of just cause under La. Ch. Code art. 1035(B). This she has failed to do. Furthermore, PC has failed to show substantial compliance with the case plan during the relevant period. See State ex rel. C.P., supra at p. 19, 768 So.2d at 144.
This assignment of error is without merit.
CONCLUSION AND DECREE
1 ¡¡¡..For the foregoing reasons, the judgment of the trial court is affirmed and each party is to bear its own costs.
AFFIRMED.[4]
LOMBARD, J., dissents.

. In accordance with the practice of this Court, we have used initials in order to protect the children’s privacy.

. On October 24, 2002 the trial court rendered an initial post-termination judgment concurring with the children’s permanency plan of adoption, ordering OCS to make all reasonable efforts to achieve early permanency by immediately transferring this case to the OCS adoptions unit and by obtaining adoption photographs of the children no later than November 8, 2002. The court ordered that the children remain in the legal and physical care, custody and control of the OCS and found this placement to be the most appropriate and least restrictive placement for the children and in the best interests of their welfare, health and safety. The court provided that in the event of urgent circumstances affecting the children's welfare, health or safety requiring alternative placement, OCS/ DSS was authorized in its sound and considered discretion to change placement in the children's best interests. However, OCS/DSS was ordered to notify the Court and all counsel immediately of any such change of placement. The court ordered liberal sibling visitation and specific counseling and treatment.

. Counsel for PC admits in brief that although he initially paid Dr. Cambias' and Ms. Nelson’s fees, OCS eventually reimbursed these charges.

. This opinion was approved by Chief Judge Byrnes prior to his death.