2016-0694 (La.App. 4 Cir. 12/8/16)
**STATE of Louisiana IN the INTEREST OF D.B.**

**NO. 2016–CA–0694**

Court of Appeal of Louisiana,
Fourth Circuit.

DECEMBER 8, 2016

---

Romona Jordan, Mental Health Advocacy Services, 1450 Poydras Street, Suite 1105, New Orleans, LA 70112, Katherine M. Dowling, State of Louisiana, Dept. of Children and Family Services, 1450 Poy-

dras Street, 16TH FLOOR, New Orleans, LA 70112, COUNSEL FOR APPELLANT/STATE OF LOUISIANA

Laura S. Brown, Liskow & Lewis, 701 Poydras Street, Suite 5000, New Orleans, LA 70139—5099, COUNSEL FOR APPELLEE/K.T.

(Court composed of Judge Dennis R. Bagneris, Sr., Judge Roland L. Belsome, Judge Joy Cossich Lobrano)

Judge Joy Cossich Lobrano

In the case *sub judice*, this Court must decide whether a putative father's parental rights should be terminated under La. Ch. C. art. 1015 when the facts indicate that he may not know that his sexual relationship with a mother resulted in the birth of a child. Answering that question affirmatively, we reverse the judgment of the juvenile court and terminate the putative father's rights to the child, D.B.

D.B., who is twelve years old, is the eldest of four children born to her Mother, E.B ("Mother"). At the time of her birth, no father was named on D.B.'s birth certificate, although Mother has named K.T. as D.B.'s father. D.B. has been diagnosed as autistic, and suffers from speech and language impairments. Throughout D.B.'s childhood, the Department of Children and Family Services ("DCFS") received reports of abuse and neglect committed against D.B. and her siblings. After some of these reports were validated, DCFS's Family Services Unit attempted to work with the family, referring Mother to parenting education, substance abuse treatment, and mental health treatment. Following Mother's noncompliance, in October of 2014, when D.B. was ten, D.B. and her siblings were placed in foster care.

The children were designated as Children in Need of Care, and a concurrent case plan of reunification/adoption was approved by the juvenile court. Sixteen case review hearings were held, and DCFS attempted to find D.B.'s alleged father, K.T., by speaking to Mother, asking relatives for information, and running CLEAR searches.[1] However, when the plan was reviewed nearly a year later, K.T. remained absent, and Mother had not made satisfactory progress on her case plan. Thus, the goal of the plan was changed to adoption, and DCFS petitioned to terminate the parental rights of Mother and the fathers of her children. A curator was appointed to represent K.T. in the termination proceedings. The curator used newspaper advertisements, Westlaw public records searches, and internet searches in an attempt to locate K.T., all of which were unsuccessful.

At one point, the caseworker learned from Dr. Dickson, the LSU Infant Team professional who was working with Mother, that Mother had named an alternative man, D.W., as D.B.'s father.[2] When the caseworker attempted to verify this information with Mother, she confirmed that D.B.'s father was K.T., not D.W.

At the termination hearing, Mother testified she met K.T. at a store in New Orleans, that she did not know his whereabouts, and that she could not remember when she last spoke to him. She was unable to provide any more information regarding K.T.'s identity or whereabouts. Included in the exhibits were a certificate from the putative father registry indicating no registries relative to D.B. and a certificate from the juvenile court indicat-

---

**1.** The CLEAR Search is not limited to the New Orleans area, but also returns statewide and out of state results.

**2.** Dr. Dickson testified that during a session, Mother related that D.B.'s father was D.W., and that he had been killed in an altercation.

ing no acts of acknowledgement had been filed as to D.B.

Ultimately, Mother's parental rights to D.B. were terminated[3] but K.T.'s rights were not, despite a lack of evidence that K.T. ever attempted to discover, contact, or otherwise parent his child. In so ruling the court stated: "I don't know that there is a requirement on gentlemen in the state to go around and try to find out every woman they had a relationship whether or not they are the father of the child I don't believe that's the case." The juvenile court also declined to terminate any rights D.W. might have had to D.B., even though Mother had offered uncontroverted testimony that D.W. was not the child's father, notwithstanding her earlier statement to the Infant Team.

This result left D.B. unable to be adopted, although D.B. is currently living with a certified foster mother who wishes to adopt her. Mother did not appeal the court's ruling. The State filed this appeal and is joined by D.B.

 "An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard." *State ex rel. H.A.S.*, 2010–1529, p. 11 (La. 11/30/10), 52 So.3d 852, 859 (internal citations omitted). In a termination proceeding, "[t]he petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." La. Ch. C. art. 1035(A). The Louisiana Supreme Court has expressed its "unique concerns" regarding termination of parental rights as follows:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have

a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing those interests, the courts of this state have consistently found *the interest of the child to be paramount over that of the parent.*

*H.A.S.*, at 2010–1529, pp. 11–12, 52 So.3d at 859–60 (internal citations omitted) (emphasis added). The guiding principle that the child's interest is paramount is reflected in the Louisiana's Children's Code. For instance, Children's Code article 1004.1 provides:

> The department *shall file* and pursue to judgment in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless the department has documented in the case plan a compelling reason why filing is not in the best interest of the child.

La. Ch. C. art. 1004.1 (emphasis added). At the time of the termination hearing, D.B. had been in foster care for approximately 19 months.

 A mere biological link between a father and child "does not guarantee him a constitutional stake in his relationship with that child, such a link combined with a

---

**3.** The results of the termination hearing as to Mother's other children are not pertinent to the issues raised by this appeal.

substantial parent-child relationship will do so." *In re Adoption of B.G.S.*, 556 So.2d 545, 550 (La. 1990). "If the natural father does not respond or cannot be located within a reasonable time, then the court may terminate his parental rights and continue with the adoption proceedings." *Id.* at 558. In order to protect the child's interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships, Children's Code article 1015 provides grounds by which parental rights may be terminated. In this case, K.T.'s actions and inactions constitute one of those grounds—abandonment. Article 1015 allows for termination of parental rights due to abandonment under the following circumstances:

The grounds for termination of parental rights are:

. . . .

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

La. Ch. C. art. 1015.

The record before this court shows that K.T. has abandoned D.B. The whereabouts of K.T. (as well as D.W.) have been unknown for the entire pendency of these proceedings, which were initiated in October 2014, well over four months prior to the termination hearing. In the months following the October 2014 custody order, ongoing diligent efforts to locate the alleged fathers yielded no results.

■ The curator appointed as counsel for K.T. argues that under article 1015(5), a parent's conduct must constitute a ground for termination and the parent must demonstrate an intention to permanently avoid parental responsibility. Because K.T. was not told of his paternity, the curator reasons, K.T. cannot form the requisite intent to abandon D.B. This interpretation is a misreading of the article. Rather than requiring evidence of intent separate from the specified termination grounds, the statute clearly sets forth three grounds by which a parent demonstrates his intent to permanently avoid parental responsibility. La. Ch. C. art. 1015(5)(a)–(c). There is nothing in the statute to support the argument by K.T.'s counsel that article 1015(5) termination requires a demonstration of intent by some means in addition to or beyond the three listed methods.

In fact, under a prior version of the abandonment article (then a statute), La. R.S. 9:403 (repealed by Acts 1991, upon the enactment of the Louisiana Children's Code), abandonment did require evidence of intent separate from an act on the part of the parent. Then, abandonment required proving either:

(a) The child has been deserted for a period of at least four months by his parent or parents, the whereabouts of his parent or parents are unknown, the parent or parents have made no provision for the child's care and support *and have shown an intention to avoid parental responsibility*; or

(b) The parent or parents have failed to provide for the care and support of the child for a period of at least four months *under circumstances showing an intention to permanently avoid parental responsibility.*

La. R.S. 9:403 (repealed by Acts 1991) (emphasis added); *see, e.g., State in Interest of DLB,* 612 So.2d 871, 873 (La. App. 4 Cir. 1993) (interpreting the statute as it was prior to the 1991 repeal, stating that under the law as it was in force until the repeal, "[t]he court will enter a decree of abandonment only where the evidence clearly manifests the parent(s)' intention to permanently avoid their responsibility toward the child ....."). However, the changes to the language of the statute reflect an important difference. The current version of abandonment states that a parent is *"demonstrating* an intention to permanently avoid parental responsibility *by* any of the following..." and then provides a list of conduct constituting abandonment. In contrast, the pre–1991 version lists conduct and then requires that the parents "have shown an intention to avoid parental responsibility" or that they undertook the conduct "under circumstances showing an intention to permanently avoid parental responsibility." *Compare* La. R.S. 9:403 (repealed by Acts 1991) with La. Ch. C. art. 1015 (emphasis added).

Particularly, La. R.S. 9:403(b) (repealed by Acts 1991) required failure to provide care and support for at least four months "under circumstances showing an intention to permanently avoid parental responsibility," whereas the current article requires only that "[f]or a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown." La. Ch. C. art. 1015(a). "Legislation is a solemn expression of legislative will," La. Civ. Code art. 2, and thus this Court is bound to interpret this change in legislation as a change in legislative will. If

the legislature intended that the parent be absent for four months "under circumstances showing an intention to permanently avoid parental responsibility," it would not have removed this qualifying clause from this statute.

■ While it is undisputed that all three enumerated grounds for abandonment under the current statute are met, considering only the first ground—whereabouts unknown for four months prior to hearing—it is clear that in this case both K.T. and D.W.s whereabouts have been unknown for terms better counted in years, not months. Further, while not directly addressing the question, this circuit has previously affirmed a district court's finding that "[a]s to the unknown father(s), the absence of notation in the Putative Fathers' Registry and the Clerk's Certificate of No Acknowledgement of an Illegitimate Child provide clear and convincing evidence that those father(s) have abandoned the children." *State ex rel. A.W.,* 2003–1180, 16–17 (La. App. 4 Cir. 10/22/03), 860 So.2d 576, 585, *rev'd on other grounds on reh'g* (Dec. 22, 2003)(stating that "[o]ur review of the record in its entirety convinces us that the trial court correctly found that the State offered clear and convincing evidence, largely uncontroverted, warranting termination of the parental rights of ... any other unknown father(s) of the children." *Id.* at 21; 588.). Regardless of K.T.'s lack of knowledge of his paternity, his actions constitute abandonment.

Compare this situation to Louisiana Civil Code article 198, which establishes the time period for a father's paternity action. If D.B. was filiated to another man, regardless of K.T.'s lack of knowledge of his paternity, the peremptive period for K.T. to establish his paternity via a paternity action would still have passed on D.B.'s tenth birthday. Official Revision Comment

(e) to art. 198 states that requiring a biological father to "act quickly to avow his biological paternity" is "intended to protect the child from the upheaval of such litigation and its consequences in circumstances where the child may actually live in an existing intact family with his Mother and presumed father or may have become attached over many years to the man presumed to be his father." Here, D.B.'s situation causes a similar concern. Although D.B. is not filiated to a father, D.B. is living in a loving and caring environment that her foster parent wishes to make permanent, and has been there for significant time. If she were removed from her foster home, she would suffer the exact consequences the Legislature has sought to avoid with respect to a late-appearing biological father regardless of his knowledge of paternity, as evidenced by Comment (e) to article 198.

Also instructive are the provisions of Children's Code article 1136, "Absentee alleged or adjudicated fathers; curator." While this article is incorporated in Title XI, governing voluntary surrender of parental rights (rather than Title X, governing involuntary termination), it nonetheless provides guidance in situations where an alleged father is identified but his whereabouts are unknown. Under article 1136, when "the alleged or adjudicated father of the child is identified but his whereabouts are unknown," the court is required to appoint a curator who must undertake "a diligent effort to locate the alleged or adjudicated father within seven days, exclusive of legal holidays, from the date of his appointment." La. Children's Code, art. 1136(A) & (B). "[U]pon finding that a diligent effort has been made to locate the alleged or adjudicated father, but that he has not been located *within thirty days* from the appointment of the curator, *the court shall terminate the alleged or adjudicated father's parental rights*," upon motion of the agency or attorney for the prospective adoptive parent. La. Children's Code, art. 1136(C).

Thus, in the analogous situation where a mother has voluntarily surrendered her parental rights (in contrast to the present case, in which Mother's rights were involuntarily terminated), and has named an alleged father who cannot be located with diligent effort (as in the present case), the statutory scheme provides for termination of the father's rights within 30 days from the appointment of a curator. Analogizing to the case *sub judice*, the requirement of a four-month period during which an alleged father's whereabouts are unknown as provided for in La. Ch. C. art. 1015(5) constitutes ample time for a diligent search to protect the due process rights of a putative father in an involuntary termination proceeding.[4]

Accordingly, K.T. (and D.W.'s) unknown whereabouts, which preceded the initiation of this juvenile case 19 months prior to the termination hearing, support the granting of the petition for termination. To find otherwise would lead to the absurd result that a biological father who sought to avoid parental responsibility by keeping his whereabouts unknown could forever foreclose the possibility of his offspring's adoption.

After a statutory termination ground is satisfied, the court must also find that termination is in the best interest of the child. La. Ch. C. art. 1035; *see, e.g., State*

---

4. Furthermore, it is noted that Mother's trial testimony that K.T. was D.B.'s father, she did not know K.T.'s whereabouts, and could not recall their last contact meets all the requirements for sufficient proof under article 1136 that "the alleged or adjudicated father's whereabouts are unknown and that a diligent effort was made to locate him" are satisfied in this case. *See* La. Ch. C. art. 1136.

*in the Interest of C.M.O., C.M.K., and C.M.K.*, 2004–1780, pp. 2–3 (La. App. 4 Cir. 4/13/05), 901 So.2d 1168, 1170; *State in the Interest of K.T. and D.K.T.*, 2002–2009, p. 3 (La. App. 4 Cir. 2/21/03), 841 So.2d 67, 69. As the Louisiana Supreme Court explains:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. *The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated.* As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

██ *H.A.S.*, 2010–1529, pp. 11–12, 52 So.3d at 859–60 (internal citations omitted) (emphasis added). "While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to insure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the child.…" *State in the Interest of S.M.*, 98–0922, p.15 (La.10/20/98), 719 So.2d 445, 452.

██ The record supports a finding that the best interest of D.B. would be served by the termination. At this point, her Mother's parental rights have been terminated, and her father's whereabouts have been unknown for years. She is a high needs child with an autism diagnosis and significant educational accommodation requirements. She remains a ward of the State, despite the fact that her certified foster parent is willing to adopt her. Granting the termination petition as to the alleged fathers would make her adoption possible.

Importantly, the curator does not expressly challenge the fact that termination would be in D.B.'s best interest. However, the curator does argue that D.B.'s rights are protected as she is living now, in foster care, which the curator calls the "status quo." This Court disagrees. D.B. will need parental care long past the age of majority, and her right to form secure, stable, long-term, and continuous relationships found in a home with proper parental care outweigh any procedural due process interest that may remain with K.T. after DCFS's diligent search and the curator's own diligent search efforts.

██ Finally, with respect to the juvenile court's assertion that there is not "a requirement on gentlemen in the state to go around and try to find out every woman they had a relationship [and] whether or not they are the father of the child," it is respectfully suggested that while it may be the case that statutory law does not impose this affirmative duty for men to follow up with their sexual partners, in the absence of any effort by a potential father to learn if a sexual relationship has resulted in offspring, there is no basis in law for him to be entitled to the due process protections given to a father who has acknowledged his child and acted responsibly. *B.G.S.*, 556 So.2d at 558.

Thus, the district court manifestly erred by refusing to terminate the parental rights of K.T. and D.W. For all of the foregoing reasons, the judgment of the juvenile court is reversed, and judgment is rendered terminating the parental rights of K.T. and D.W. as to D.B.

**JUDGMENT REVERSED; RENDERED.**

BELSOME, J., CONCURS IN THE RESULTS.