# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-992


**STATE IN THE INTEREST OF**

**K. D. M., K. J. M. & K. K. B.**




**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 3128
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## D. KENT SAVOIE
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Shannon J. Gremillion, and D. Kent Savoie, Judges.


**AFFIRMED.**


**Robert L. Kennedy**
**Grant Parish District Defender**
**352 2nd Street**
**Colfax, LA 71417**
**(318) 627-3255**
**COUNSEL FOR APPELLANT:**
      **D. M. (father of K.D.M & K.J.M)**

**Guy R. Lain**
**Louisiana Dept. of Children and Family Services**
**Bureau of General Counsel**
**1721 Carter Street**
**Vidalia, LA 71373**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana, Dept. of Children and Family Services**

**Thomas Gardiner Wilson**
**Attorney at Law**
**420 Kings Drive**
**Pineville, LA 71360**
**(318) 201-2807**
**COUNSEL FOR OTHER APPELLEE:**
**K.M. (mother)**

**Hon. James Patrick Lemoine**
**D.A., 35th JDC**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-3205**
**COUNSEL FOR OTHER APPELLEE:**
**State of Louisiana**

**Jacqueline Chevette Williams**
**Assistant District Attorney**
**P.O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2244**
**COUNSEL FOR OTHER APPELLEES:**
**K. D. M.,**
**K. J. M.**
**K. K. B.**

**Joseph P. Beck, III**
**Attorney At Law**
**5529 Monroe Hwy**
**Ball, LA 71405**
**(318) 640-9202**
**COUNSEL FOR OTHER APPELLEE:**
**D. B. (father of K.K.B.)**

**Jerrica Wilson**
**Case Worker**
**900 Murray Street**
**Alexandria, LA 71301**
**(318) 487-5054**
**COUNSEL FOR OTHER APPELLEE:**
**Grant Dept of Children and Family Svcs**

**SAVOIE, Judge.**

D.M.,[1] who is the biological father of twin children, K.D.M. and K.J.M.[2], appeals the trial court's order terminating his parental rights. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 18, 2017, the State, through the Department of Children and Family Services (the State), sought and obtained an instanter order from the trial court placing K.D.M. and K.J.M., and also K.K.B, who is another child with a different father, in the temporary custody of the State. The children were placed in foster care. K.D.M. and K.J.M. were eight years old at the time, and K.K.B. was one. In support of the instanter order, the State alleged that the mother of the three children provided inadequate shelter and "sells her food stamps, smokes synthetic marijuana on a daily basis in the presence of the minor children, and the trailer in which they lived was in bad condition, there are no working utilities in the home, and the children looked malnourished." In addition, the State alleged that, at the time, school had been in session for three weeks, yet the children had not attended during that time. The State also alleged that it eventually made contact with the children's mother, who provided false information concerning the whereabouts of the children. The State further alleged that the family had previously been offered services on two separate occasions; however, the cases were closed due to the mother's noncompliance.

---

[1] Initials of the parties are used in this matter pursuant to Uniform Rules, Courts of Appeal – Rules 5-1 and 5-2.

[2] We note that in the trial court and appellate counsel refer to K.J.M. as "K.C.M." However, for purposes of consistency with the docketing of this matter, we will use "K.J.M."

On August 29, 2017, the State filed a Petition seeking to declare K.D.M., K.J.M., and K.K.B. as children in need of care. Therein it alleged that D.M. was the father of K.D.M. and K.J.M., and that K.B. was the father of K.K.B. Given that this appeal involves only D.M. with respect to K.D.M. and K.J.M., we will not further discuss actions taken in the trial court with respect to K.B. and/or K.K.B.

A continued custody hearing was held August 21, 2017. The children's mother and her attorney were present in court. Counsel for D.M. also made an appearance on D.M.'s behalf and noted that D.M. was incarcerated. Following the hearing, the trial court rendered an order the same day finding that it was in the children's best interest for them to remain in the custody of the State. The order further advised the parents of their rights and responsibilities, including their responsibility to keep the State apprised of their current address, and to cooperate in preparing a case plan and meeting the needs of their children.

The matter was heard again on September 6, 2017. Counsel for the mother, and counsel for D.M., were present, as well as a Court Appointed Special Advocate (CASA) on behalf of the children. An adjudication hearing was then held on October 11, 2017. D.M., through counsel, was present, as well as the mother and her counsel. D.M.'s counsel again indicated that D.M. was incarcerated. During the October 11, 2017 hearing, a Case Plan dated September 13, 2017, was offered and accepted by the trial court.

The September 2017 Case Plan reflected that D.M. participated by phone. It stated that the primary goal with respect to K.D.M. and K.J.M. was reunification, with a secondary goal of adoption. The plan stated that D.M. "will support his children in foster care and agree to pay $10.00 per month per child . . . when not working and $25.00 per month per child if working." It further provided that

visitation would occur on the second and fourth Thursdays, and included specific action steps to be taken by D.M., including maintaining safe housing, participating in a substance abuse assessment and screenings, and attending visitation. The plan further stated that D.M. "will maintain contact with the Agency, report all changes in situation such as: employment, address change, telephone number, etc. He will attend all court hearings, FTC's and any other meetings or functions concerning the children."

D.M. was incarcerated at the time of the September 2017 case plan, and his case worker, Ms. Jerrica Wilson, provided a copy of the plan to him when she visited with him in jail in October 2017.

Following the October 11, 2017 hearing, the trial court rendered a Judgment finding that it was in K.D.M.'s and K.J.M.'s best interests to remain in the State's custody. The Judgment also advised the parents of their rights and responsibilities, adjudicated the children in need of care, and set a case plan review hearing for February 7, 2018.

On January 31, 2018, the State filed with the court a report dated January 22, 2018. Therein, the State noted that "[D.M.'s] whereabouts are unknown. [D.M.] was released from jail on November 1, 2017. [D.M.] has contacted this worker one time since being out of jail. He has not had any more contact with the agency." The report further noted that D.M.'s employment status was unknown and that he had not completed the case plan's required substance abuse assessment, parenting education, or financial contributions.

Also on January 31, 2018, the State filed a Case Plan dated January 23, 2018. The plan reflected that all three children had been placed with the same foster family and K.D.M. and K.J.M. had changed schools due to this placement. It also reflected

that D.M. had not fulfilled any of the required obligations and further stated that D.M.:

> was incarcerated . . . until November 1, 2017. The worker visited with him once while he was in jail. Worker had contact with him one time in November when he was released and notified of a family visit. He did not show up and has not been in contact with the Agency since November 2017.

A case plan review hearing was held February 7, 2018. Counsel for D.M. made an appearance on his behalf. Thereafter, the trial court entered a Judgment ordering the children to remain in the State's custody and approving the January 23, 2018 case plan.

On July 20, 2018, the State submitted a report dated July 25, 2018, to the trial court, which stated as follows with respect to D.M.:

> [D.M.]'s whereabouts are unknown. [D.M.] was released from jail on November 1, 2017. [D.M.] has contacted this worker one time in November 2017. He has not had any more contact with the Agency. Clear searches have been completed but did not turn up any information on his whereabouts. The Grant Parish Child Support office contacted this worker in June 2018. They located [D.M.] in Richland Correctional Center for a misdemeanor and resisting an officer. The office had pursued child support for [D.M.] Once located and brought forth in front of your Honor, he denied being the father of [K.D.M.] and [K.J.M.] and requested a DNA test. The test was completed and results showed that he is the father of the twins. [D.M.] was released from jail on June 29, 2018.

The July 25, 2018 report further reflected that D.M.'s employment status was unknown, he had not provided any financial support for the children, and he had not completed the requisite substance abuse assessment or parenting education. It also stated that D.M. "has never visited the children since they have been in foster care."

Also on July 30, 2018, the State submitted a Case Plan dated July 2, 2018, to the trial court. This plan similarly noted that D.M. had not provided financial support

4

for the children, his whereabouts were unknown, and he had not completed any of the plan's action steps.

Another case review hearing was held on August 15, 2018. Counsel for D.M. made an appearance on his behalf but noted "he has been absent." Following the hearing, the trial court found that it was in the children's best interest to remain in the State's custody, and it approved the July 2, 2018 case plan, as amended on July 25, 2018, to change the case plan goal to adoption.

On August 31, 2018, the State filed a Petition for Termination of Parental Rights and Certification of Minor Children for Adoption, naming D.M. and the mother as Defendants. Therein, the State alleged that D.M. and the mother have failed to substantially comply with their case plans, provide significant contributions to the care of their children well in excess of six consecutive months, and have not had significant contact with the children. The trial court signed an order on September 4, 2018, appointing a Curator Ad Hoc for D.M., and set the matter for hearing.

A hearing on the State's Petition was held November 14, 2018. D.M. was transferred from the Richland Parish Detention Center pursuant to a motion filed by appointed counsel and was present for the hearing. Thereafter, the trial court rendered a judgment terminating D.M.'s parental rights with respect to K.D.M. and K.J.M. and certified the children as available for adoption.

D.M. appealed. On appeal, D.M. asserts the following as assignments of error:

(1) The [trial] [c]ourt erred in finding that [D.M.] violated any provision of Article 1015 of the Louisiana Children's Code sufficient to warrant the termination of his parental rights with regard to K.D.M. and K.[J].M.

(2) The [trial] [c]ourt erred in finding that [D.M.] did not communicate with [the State].

(3) The [trial] [c]ourt erred in failing to recognize that the time period from when [D.M.] actually had knowledge that he was the father of the children K.D.M. and K.[J].M. as a result of DNA testing which was in June 2018 until the termination hearing on November 14, 2018[,] was insufficient to address his reconciliation issues and in violation of Article 1015 of the Louisiana Children's Code.

(4) The [trial] [c]ourt erred in failing to consider that the [State's] contention that during the many proceedings at which [D.M.] was not present it . . . was alleged that [D.M.]'s whereabouts were unknown was incorrect because much of the time he was incarcerated[, and] when he was free his whereabouts were known to his parole officer, and to Child Support Services.

## ANALYSIS

Louisiana Children's Code art. 1015 provides various grounds for the termination of parental rights, including:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
>
> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

With respect to a parent's failure to substantially comply with a case plan as contemplated by La.Ch.Code art. 1015(6), La.Ch.Code art. 1036(C) states:

6

C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

The State is only required to establish one of these statutory grounds. *State ex. rel. ML*, 95-45 (La. 9/5/95), 660 So.2d. 830.

In *State ex rel. D.H.L.*, 08-39, pp. 4-5 (La.App. 3 Cir. 4/30/08), 981 So.2d 906, 910 (footnotes omitted), we discussed the State's burden of proof and our standard of review in connection with termination of parental rights proceedings as follows:

Our supreme court has recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof than the preponderance of the evidence standard; rather, the State must prove by clear and convincing evidence at least one of the statutory grounds contained in La.Ch.Code art. 1015 in order to terminate a parent's rights. *See State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d

7

1247; La.Ch.Code art. 1035(A). "Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests." *State ex. rel. J.M.*, 837 So.2d at 1253; *see also* La.Ch.Code art. 1037(B).

An appellate court cannot set aside a juvenile court's findings of fact regarding the termination of parental rights unless it is manifestly erroneous or unless those findings are clearly wrong. *In re A.J.F.*, 00-948 (La.6/30/00), 764 So.2d 47; *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

In *Interest of CLS*, 94-531, pp. 5-6 (La.App. 3 Cir. 11/2/94), 649 So.2d 532, 536 (internal citations omitted), we explained:

Proof by clear and convincing evidence requires a party to persuade the trier of fact that the fact or causation sought to be proved is highly probable, i.e. much more probable than its non-existence. This burden is an intermediate one between the burden of proof by a preponderance of the evidence and the burden of proof beyond a reasonable doubt. Proof by clear and convincing evidence requires more than a "preponderance" of the evidence, the traditional measure of persuasion, but less than "beyond a reasonable doubt," the stringent criminal standard.

We further keep in the mind the following, as recognized by the Louisiana Supreme Court in *State ex rel. J.A.*, 99-2905, pp. 7-8 (La. 1/12/00), 752 So.2d 806, 810-811:

In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also *State in the Interest of S.M.*, 98-0922 (La. 10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of

the child to be paramount over that of the parent. See, *e.g., State in the Interest of S.M.*, 719 So.2d at 452; *State in the Interest of A.E.*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir. 1982).

In its oral reasoning for terminating D.M.'s parental rights, the trial court stated as follows:

> [D.M.] had um, a requirement to provide housing for the children. Um, Ms. Wilson [the case worker] testified that in October of 2017, that [D.M.] identified his sister as a possible relative . . . placement. I don't think Ms. Wilson testified as to why that placement was not attempted, uh, but [D.M.] did offer that apparently his sister . . . was going through some issues at that time, that he was unaware of, and that possibly that was a reason the children weren't placed there.

> . . . Ms. Wilson testified that in November of 2017, that [D.M.] was released. Um, both Ms. Wilson and [D.M.] testified that there was a telephone communication at some point in November of 2017. Um, the substance of that telephone conversation was not really discussed. I believe Ms. Wilson testified that she was having difficulty hearing [D.M.] on the telephone call. Um, but Ms. Wilson testified that after that brief telephone call, that she had no other contact with [D.M.]

> There was testimony that in October of 2017, Ms. Wilson discussed and provided a case plan to [D.M.] that outlined the requirements of his case plan which, according to her testimony, consisted of stable housing . . . parental contributions. She testified that she was requiring substance abuse treatment due to a history of drug convictions.

> Maintaining visits with the children, and maintaining contact with her. Ms. Wilson testified that after the November 17th phone conversation, she had no contact therefore, according to her testimony, there has been no provision of stable housing, no parental contributions, no visits with the children, no substance abuse treatment, uh, by [D.M.]

> . . . .

> Given the time that has passed, and the improvements that are being made by the children in their foster home, um, the Court does not belief that there is a likelihood that . . . [D.M.] would substantially comply with the case plan in the near future[.]

On appeal, D.M. argues that the State failed to sufficiently establish that: (1) D.M. failed to provide significant financial contributions for six consecutive months,

as contemplated by La.Ch.Code art. 1015(5)(b); (2) D.M. failed to maintain contact with the children by visiting or communicating with them for six consecutive months, as contemplated by La.Ch.Code art. 1015(5)(c); and (3) D.M. failed to substantially comply with the case plan for more than a year after the children were removed, as contemplated by La.Ch.Code art. 1016(6). In support of his arguments, D.M. primarily relies on the fact that the termination hearing was held only six months after his positive DNA test in June 2018; therefore, according to D.M., he has not been provided with an adequate amount of time to comply with the case plan.[3]

In response, the State notes that it sought termination of D.M.'s parental rights due to his alleged failure to comply with the court-ordered case plan, and abandonment by failing to financially support the children and/or have significant contact with them. It argues there is no support for D.M.'s position that he had no obligations under the case plan or otherwise with respect to the children until he underwent a DNA test in a separate Child Support Enforcement proceeding and obtained the results, especially when he had not challenged paternity in connection with the instant proceedings.

At the termination hearing, D.M.'s caseworker, Jerrica Wilson, testified that D.M. participated by phone as the father of K.D.M. and K.J.M. in connection with the development of the initial September 2017 case plan, noting that D.M. was incarcerated at the time. His phone participation is also reflected on the case plan document. Ms. Wilson further testified that she gave D.M. a copy of the case plan when she met with him in jail in October 2017. Also according to Ms. Wilson,

---

[3] D.M. also argues that the State failed to sufficiently prove that D.M.'s whereabouts were unknown for at least four months, as contemplated by La.Ch.Code art. 1015(5)(a); however, because the State did not seek, or obtain, relief on these grounds, we do not consider whether said grounds were sufficiently proven.

approximately a week after D.M. was released from jail in November 2017, D.M. contacted her by phone and she advised him of a visitation scheduled that day; however, D.M. did not attend. Ms. Wilson further testified that D.M. did not make any further contact with her after November 2017 and failed to comply with any component of his case plan since the children had entered into the State's care in August 2017. He has not had any contact with the children or contributed financially for them since they came into the State's care in August 2017.

D.M. did not dispute his noncompliance with the case plan at the hearing. He admitted that he failed to contact his caseworker after November 2017. He also testified that at the time of the November 2018 termination hearing, he was incarcerated as a result of two misdemeanor charges and his release date was being "work[ed] on." He also indicated that he had a job "waiting for" him upon his release from jail. No other details regarding this job opportunity were provided. He further indicated that while he did not own a vehicle, he had "access" to one. When asked about his living situation upon being released from jail, he stated that his aunt and sister live with him, and he further testified as follows when questioned by the trial court:

> Q. [D.M.] who . . . did you list as possible family placement for the children?
>
> A. Uh, uh, I listed my oldest sister, . . . but I didn't know that she was going through trials and tribulations in her life at the time, because . . . I did three and half (3/12) years in Tensas . . . with no communication to the outside world whatsoever. When I left the street, my sister had a house, she had a car, and she was doing good. Now she got a three (3) bedroom trailer . . . . I've been there working on it. I did all the plumbing for her, . . . I hooked the box up to the pole . . . . Lights, gas all that's on right now. And . . . that will be my residence for me and my kids. My sister, she has a place already, but if I want to move there, I can move there with my kids, or I can take them to [another address] in Pineville.

When asked by the trial court regarding his attempts to contact his caseworker when not incarcerated, D.M. stated that he tried to call, and that he mistakenly thought he had go to court for it to tell him what to do because he had taken his mother's and grandmother's word that "they were going to get my kids back." He further testified that he did not fully understand the case plan due to his lack of education.

The facts in this case are undisputed that D.M. failed to comply with the case plan as contemplated by La.Ch.Code art. 1015(6) and that he abandoned the children by failing to make financial contributions or have contact with them for six consecutive months, as contemplated by La.Ch.Code art. 1015(5). Rather, D.M. argues that his failures should be excused because he did not have an adequate amount of time to satisfy these obligations given that his paternity was not verified by a DNA test until June 2018 and he had a reasonable basis to challenge his paternity.

However, we find no legal support for D.M.'s argument that he was not required to comply with a case plan that he willingly participated in as the children's father from the date of the plan's inception in September 2017 just because he waited nine months to ask for a DNA test. He did not challenge his paternity in these proceedings, rather he simply failed to sufficiently comply with the case plans.

In support of his position, D.M. cites to *State in Interest of I.D.*, 11-1570 (La.App. 3 Cir. 4/4/12), 87 So.3d 351, wherein this court affirmed the termination of the father's parental rights, but noted in the factual and procedural background section of the opinion that a hearing on the State's petition was rescheduled several times to allow the parties more time to work on their case plan. However, the *I.D.* court did not hold that the State was required to provide extra time for the parties to

12

complete the case plan, but rather was merely setting forth the procedural background of the case. Therefore, we find *I.D.* inapplicable to the issues present in the instant matter.

We further note that in *State ex rel. A.R.*, 15-497, p. 8 (La.App. 3 Cir. 11/4/15), 178 So.3d 280, 286 (alternation in original), this court addressed, and rejected, a parent's defense that incarceration limited the amount of time available to satisfy a case plan, stating:

> Imprisonment is not an excuse to escape parental obligations. *State ex rel. C.M.O.*, 04-1780 (La.App. 4 Cir. 4/13/05), 901 So.2d 1168. Incarceration is not a defense to failure to support or maintain contact with one's children in a termination of parental rights case, particularly because incarceration results from one's actions. *State ex rel. M.H. v. K.W.H.*, 40,332 (La.App. 2 Cir. 9/23/05), 912 So.2d 88. 1168.

*State in the Interest of O.L.R.*, 13-616, p. 5 (La.App. 3 Cir. 11/6/13), 125 So.3d 569, 573. This court opined that incarceration of a parent is the result of his/her own "conduct and actions" and may not be used "as an excuse for . . . failing to substantially comply with [a] case plan." *Id.*

In addition to failing to comply with a case plan under La.Ch.Code art. 1015(6), abandonment for failing to contribute financially for the support of the children, or failing to contact the children, for six consecutive months, are also grounds for termination of parental rights. La.Ch.Code. art. 1015(5). This is so, even if a putative father's paternity has not been positively established, "in order to protect a child's interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships." *State in Interest of D.B.*, 16-694, p. 4 (La.App. 5 Cir. 12/8/16), 206 So.3d 1021, 1025. Therefore, the date that the DNA test was completed is irrelevant to the abandonment analysis, and we reject D.M.'s suggestion that we should not consider his failure to

financially support or contact the children during the time prior to the June 2018 DNA test.

We conclude that the trial court's ruling is adequately supported by the record and find no merit in D.M.'s assignments of error.

## CONCLUSION

For the reasons set forth above, we affirm the trial court's ruling in this matter. Costs of this appeal are assessed to Appellant, D.M.

**AFFIRMED.**